UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LOUIS RINALDI, | : | CIVIL ACTION NO. |
| *Plaintiff,* | : | 3:02CV1524 (WWE) |
| | : | |
| v. | : | |
| | : | |
| SCOTT MARTIN AND FRED | : | |
| OLDENBURG, | : | JUNE 2, 2004 |
| *Defendants.* | | |

## MEMORANDUM OF LAW SUPPORTING THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Louis Rinaldi ("plaintiff" or "Rinaldi"), a former employee of the Department of Public Safety ("DPS"), has brought the instant suit pursuant to 42 U.S.C. § 1983 alleging that two of his former supervisors denied his constitutional right to equal protection, and further, that they retaliated against him for his union activities. Plaintiff's equal protection claim fails, however, because he is not "similarly situated" to the person he compares himself to in any material way. His claim of retaliation fails for lack of any evidence from which a reasonable jury could infer anti-union animus on the part of either defendant. Accordingly, the defendants are entitled to summary judgment as a matter of law.

## FACTUAL BACKGROUND

The plaintiff first came to DPS in 1978 as a Senior Computer Operator in the computer operations unit. Defendants' Local Rule 56(a)(1) Statement of Material Facts Not In Dispute (hereinafter "SMF"), ¶ 1. He was promoted to a Computer Operations Supervisor I in 1983, and in 1986 he was further promoted to the position of Computer

Operations Supervisor II. SMF, ¶ 2. He was put in charge of the computer operations unit's multi-shift operation, reporting to Daniel Cawley, who also supervised a computer programming unit. SMF, ¶¶ 2-3.

In 1991, Cawley was laid off, and the manager of the computer programming unit, Defendant Frederick Oldenburg ("Oldenburg"), took over Cawley's duties in addition to his own. SMF, ¶ 4. From 1991 until 2003, Oldenburg remained Rinaldi's immediate supervisor. SMF, ¶¶ 4, 5, and 16.

In 1997, Rinaldi was the subject of an Internal Affairs investigation into allegations that he signed off on employee time records that he knew to be incorrect. SMF, ¶ 8. Rinaldi identifies Gennette Fuller, who worked for him, as the source of the complaint that triggered the investigation. Rinaldi Dep., App. at 106, Trans. p. 24, lines 11-18. Oldenburg was a witness during the investigation, but had no role in initiating it, investigating it, deciding the facts, or determining the discipline that would be imposed. Defendant Martin, who was not yet one of Rinaldi's supervisors, had nothing whatsoever to do with the investigation or its outcome. SMF, ¶¶ 9, 11, 13 and 17.

The Internal Affairs investigation report was forwarded to Lt. Colonel Marjorie Kolpa, who sustained two charges based upon Rinaldi's conduct: failure to supervise, and filing false documents or information. SMF, ¶ 10. Lt. Colonel Kolpa imposed a sixty-day suspension and a demotion to Computer Operations Supervisor I as discipline SMF, ¶ 12.

Rinaldi filed a grievance challenging the discipline pursuant to his collective bargaining agreement. SMF, ¶ 14. The grievance was settled by stipulation on March 1, 1999. Rinaldi agreed to be re-assigned to perform "special assignments of a

technical nature" not involving supervisory duties. His sixty-day suspension was rescinded, and his title of Computer Operations Supervisor II was restored. SMF, ¶ 14. The Stipulation provided that Rinaldi "waive[d] any future claims in any forum concerning the issues of the grievances. . . . ." SMF, ¶ 15. As a result of the Internal Affairs investigation and the discipline that was imposed, Rinaldi was re-assigned from the computer operations unit to the computer programming unit. SMF, ¶ 16. That unit was supervised directly by Oldenburg. SMF, ¶ 4.

In January of 1999, Captain Scott Martin ("Martin") became Oldenburg's supervisor, taking over what was then called the Telecommunications Bureau. SMF, ¶ 6. Prior to that time, Martin had never supervised Rinaldi, either directly or indirectly. SMF, ¶ 7. Rinaldi claims that, at this point, he was mistreated by both defendants "for the purpose of treating him differently, and more harshly," than another employee (Amended Complaint, Count I, ¶ 11), and "for the purpose of punishing the plaintiff for his exercise of his protected First Amendment rights" – to wit, "his association with the union representing persons of his classification and category in the Department of Public Safety." Amended Complaint, Count II, ¶¶ 10 & 11. He filed the instant suit on August 30, 2002.

The "similarly situated" employee that serves as the basis for Rinaldi's equal protection claim is one George Davis. Complaint, Count I, ¶¶8, 10, 11, and 13; see also Rinaldi Dep., App. at 109, Trans. p. 34, lines 8-10. George Davis was a supervisor in a different Bureau who was subject to an Internal Affairs investigation in 1996 and 1997. SMF, ¶¶ 18-19. Although the complaint in Davis's case, and the charges considered, were similar to those in the Rinaldi investigation, in the Davis case, the falsification

3

charge was not sustained, and Davis received no discipline.  SMF, ¶ 19.  Neither defendant ever supervised Davis, nor did they have anything whatsoever to do with the Internal Affairs investigation of his conduct.  SMF, ¶ 21.  The investigators, supervisors, and decisionmakers for the Rinaldi and Davis investigations were all different.  SMF, ¶¶10 & 20.  Davis retired on July 31, 1997, just three months after the decision in his Internal Affairs investigation.  SMF, ¶ 22.  He was briefly brought back as a 're-hired" employee from August of 1997 until June of 1998, and has not worked for the Department since that time.  SMF, ¶ 22.  He received his last performance evaluation prior to the Internal Affairs investigation into his conduct.  SMF, ¶ 23.

     Resolution of the Plaintiff's claims of retaliation for union activity requires consideration of the following additional uncontested facts.  Rinaldi joined the Connecticut State Employees Association ("CSEA") in 1987.  SMF, ¶ 24.  He became a union steward in 1992.  Id.  Oldenburg was Rinaldi's supervisor when he became a union steward, and continued as his supervisor until they both retired in the summer of 2003.  SMF, ¶¶ 4, 5, 16.  Oldenburg never gave Rinaldi trouble about being absent from work when representing people in his capacity as a union steward, nor did Rinaldi recall Oldenburg making any comments indicating that he had problems with the union itself, although he occasionally disagreed with some of its positions.  SMF, ¶ 27.  Oldenburg paid union dues the entire time he was employed by DPS, and had no trouble with the union or Rinaldi's work on the union's behalf.  SMF, ¶ 28.  Martin likewise had no trouble with the union, or with Rinaldi's union work; he was a union member himself from the time he joined the State Police until he was promoted to Lieutenant in 1995.

4

SMF, ¶ 25.  Martin never indicated that he had a problem with Rinaldi's union activities. SMF, ¶ 26.

### **LEGAL STANDARD FOR GRANTING A MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, this Court should grant summary judgment when "there is no genuine issue as to any material fact . . . and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In cases such as this, where the movant is the defendant, that party must demonstrate that the nonmoving party, the plaintiff, lacks evidence to support an essential element of his claim.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  The movant's burden is "discharged by showing – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."  Id.

Once the movant has met this initial burden, the opposing party must present evidence establishing a material issue of fact.  Celotex, 477 U.S. at 325.  The nonmoving party must go "beyond the pleadings" and present evidence designating "specific facts showing that there is a genuine issue for trial."  Id. at 324.  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

To grant a motion for summary judgment in favor of the defendant, the court does not need to find that there is literally no evidence in favor of the plaintiff.  "The judge's inquiry . . . unavoidably asks whether reasonable jurors could find by a

preponderance of the evidence that the plaintiff is entitled to a verdict – whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party . . . upon whom the onus of proof is imposed." Liberty Lobby, 477 U.S. at 252 (internal citations and quotations omitted).

Thus, an issue is not genuine if it is unsupported by evidence or is created by evidence that is "merely colorable" or "not significantly probative." Liberty Lobby, 477 U.S. at 250. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Id. at 252. A fact is not material unless it is, under controlling substantive law, an essential element of the nonmoving party's case with respect to which he has the burden of proof at trial. Id. at 248. Thus, to survive a motion for summary judgment, the nonmoving party must come forward with specific evidence of every essential element of his case so as to create a genuine issue for trial. Celotex, 477 U.S. at 323; Larkin v. Town of West Hartford, 891 F. Supp. 719, 723 (D. Conn. 1995), aff'd, 101 F.3d 109 (2d Cir. 1996), quoting Celotex.

## ARGUMENT

**I. PLAINTIFF'S EQUAL PROTECTION CLAIM MUST BE REJECTED BECAUSE HE IS NOT SIMILARLY SITUATED TO GEORGE DAVIS IN ANY RELEVANT RESPECT.**

In Count I of the Complaint, the plaintiff alleges that he was treated differently, and more harshly, than George Davis, whom he claims was "similarly situated," and that this was done "intentionally and irrationally." Undisputed facts demonstrate that George Davis was not, in fact, "similarly situated;" consequently, this claim must fail.

6

Since the plaintiff does not claim to be a member of a protected group, his equal protection claim must be considered a "class of one" claim pursuant to Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (recognizing cause of action under equal protection clause where plaintiff "alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment").  The first step in the Olech analysis is to identify a person or persons who are "similarly situated."  This Court, borrowing from Title VII cases, has held that the person or persons needs to be "similarly situated" in "all material respects."  See Clarke v. Sweeney, 2004 U.S. Dist. LEXIS 5028, * 64 (D. Conn. 2004); see also Diggs v. Town of Manchester, 303 F. Supp. 2d 163, 178 & 183 (D. Conn. 2004) (applying "all material respects" standard in Title VII discussion, and relying on that analysis to deny equal protection claim as well);  Padilla v. Harris, 285 F. Supp. 2d 263, 271 (D. Conn. 2003) (same).

Even if persons similarly situated have been treated differently, a cause of action does not lie unless there is no rational basis for the difference in treatment.  As this Court observed,

> [T]he Second Circuit has made clear that a plaintiff would be required to show that the decision was irrational and wholly arbitrary, in other words, that there was no legitimate reason for the decision.
>
> Moreover, we are to afford governmental decisions a strong presumption of validity.  A governmental decision should be upheld if there is any reasonably conceivable state of facts that could provide a rational basis for the different treatment.

Galligan v. Town of Manchester, 2003 U.S. Dist. LEXIS 8362, * 20 (D. Conn. 2003) (internal quotations and citations omitted), citing Giordano v. City of New York, 274 F.3d

7

740, 750 (2d Cir. 2001), Harlen Associates v. Incorporated Village of Mineola, 273 F.3d 494 (2d Cir. 2001), and Heller v. Doe by Doe, 509 U.S. 312 (1993).

Applying these precedents to the case at bar, it is clear that plaintiff cannot prevail.  First, it is important to note the proper temporal scope of the complaint.  The complaint was filed on August 30, 2002.  The statute of limitations for a Section 1983 suit in Connecticut is three years.  Porter v. Nussle, 534 U.S. 516, 521 n.1 (2002) (citing Second Circuit precedent).  Thus, any activities prior to August 30, 1999, cannot be part of this action.  The plaintiff's Internal Affairs investigation concluded six years ago, when Lt. Col. Kolpa imposed discipline on March 4, 1998.  SMF, ¶ 10.  Even if the subsequent grievance procedure could somehow lengthen the time for filing suit – a dubious proposition – the grievance was settled on March 1, 1999.  SMF, ¶ 14.  Only post-disciplinary actions, accordingly, would fall within the statute of limitations.

The post-disciplinary actions allegedly taken by the defendants are not extensive.  Rinaldi testified that Oldenburg gave him poor performance ratings that did not accurately reflect the work he had accomplished, and that Oldenburg failed to get him adequate training for his new job as a computer programmer.  Rinaldi Dep., App. at 110, Trans. pp. 39, line 5 through 43, line 13.  He testified that Martin (1) was rude and unprofessional in several ways; (2) that he gave Rinaldi a letter indicating that he should not work on agency computers with software and viruses; (3) that he ignored Rinaldi's requests for ergonomic equipment; (4) that he compelled Rinaldi to share a cubicle for approximately 6-8 weeks; and (5) that he did not support Rinaldi when other employees did not include him as an honoree at a retirement party.  Rinaldi Dep., App. at 111-12, Trans. pp. 43, line 14 through 49, line 20.

Assuming, as is required for purposes of this motion, that these complaints are true, the next step in the Olech analysis is to compare this treatment to the "similarly situated" individual. The individual so identified by Rinaldi is George Davis. See Complaint, Count I, ¶¶8, 10, 11, and 13; see also Rinaldi Dep., App. at 109, Trans. p. 34, lines 8-10. The key difficulty, however, is that it is undisputed that neither defendant ever supervised George Davis. SMF, ¶ 21. He worked in a different part of the office. SMF, ¶ 18. Unlike Rinaldi, Davis retired shortly after the conclusion of his Internal Affairs investigation, and thus was never subsequently given a performance evaluation. SMF, ¶¶19, 22, and 23. It is, accordingly, impossible to compare the defendant's treatment of Rinaldi – however they treated him – with their treatment of Davis. During the relevant time period, Davis was not even employed by DPS.

Nor would this analysis be different if the Court took into account Rinaldi's complaints about the discipline he received in 1998. True, both Davis and Rinaldi were the subjects of Internal Affairs investigations relating to allegations that they knowingly signed off on incorrect time records by their employees. There, however, the similarities end. In Davis' case, the charge of falsification was not sustained; in Rinaldi's case, it was. SMF, ¶¶ 10 & 19. The difference in discipline as a result is scarcely surprising, and cannot support a finding that it was "irrational." Furthermore, the defendants in this action had no role in the Davis investigation, and of the two, only defendant Oldenburg had any role at all in the Rinaldi investigation – his role limited to being a witness. SMF, ¶¶ 9, 11, 13, 17, and 21. A plaintiff in a Section 1983 case must allege, and ultimately prove, "personal involvement of [the defendants] sufficient to support their liability for wrongful acts . . . ." Ayers v. Coughlin, 780 F.2d 205, 210 (2d Cir. 1985). Since neither

9

defendant had anything to do with the discipline that was imposed on the plaintiff, let alone the differential between the discipline imposed on the plaintiff and that imposed on Davis, they cannot be held responsible for it.[1]

In light of the evident lack of similarity between the plaintiff and the individual that he identifies as being "similarly situated," the defendants are entitled to judgment on Count I as a matter of law.

## II. PLAINTIFF HAS NO EVIDENCE OF ANTI-UNION ANIMUS BY EITHER DEFENDANT.

The plaintiff's second claim is that the defendants did not treat him well because of his "association" with the union. Amended Complaint, Count II, ¶ 10. In his deposition, he testified that the retaliation claim was based on his work as a union steward, not on the fact that he filed a grievance concerning the 1998 discipline decision by Lt. Col. Kolpa. Rinaldi Dep., App. at 114, Trans. pp. 56, line 12 through 57, line 7.

The Second Circuit has recently provided a detailed analysis of the law governing this type of claim. In Cobb v. Rouse, 363 F.3d 89 (2d Cir. 2004), the court addressed a claim that Westchester County police officers had been disciplined in retaliation for their association with a union. The court held that "a public employee bringing a freedom of association claim must demonstrate that the association or associational activity at issue touches on a matter of public concern." Id. at 102. Furthermore, to survive judgment as a matter of law, there must be "enough evidence from which a reasonable jury could infer that this allegedly protected expression was a

---

[1] Finally, the plaintiff specifically waived "any future claims in any forum" concerning the 1998 disciplinary action when he settled his grievance in 1999. SMF, ¶ 15. Consequently, the disciplinary action cannot serve as a basis for this suit.

substantial or motivating factor in the defendant's decision to discipline the plaintiffs." Id. at 107.

The Cobb court assumed, without deciding, that union membership touches on a matter of public concern, while noting that the court had previously held that union activities such as handing out leaflets and distributing a union newsletter satisfied this requirement. Id. at 107, citing Clue v. Johnson, 179 F.3d 57 (2d Cir. 1999). Thus, Rinaldi's role as a union steward, which required him to "file grievances, attend regular meetings, and keep the employees abreast of changes," as well as "help[] out with . . . contract negotiations and so on" probably "touches on matters of public concern" sufficient to serve as the basis for a first amendment retaliation claim.

The problem in the instant suit, as in Cobb, is a complete dearth of evidence from which a reasonable jury could find that the defendant's alleged mistreatment of Rinaldi was motivated by any anti-union animus, or had anything to do with Rinaldi's union activities. As the court stated in Cobb,

> A plaintiff can establish the causal connection between protected expression and an adverse employment determination indirectly by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence or retaliatory animus. . . . [A] plaintiff may not rely on conclusory assertions of retaliatory motive to satisfy the causal link. Instead, he must produce some tangible proof to demonstrate that [his] version of what occurred was not imaginary.

Cobb, 363 F.3d at 108. Here, the "protected activity" – Rinaldi's activities as a union steward – were not "followed by" the adverse treatment of which he complains. He became a union steward in 1992. He first complains about actions taken against him (and not even by the defendants) in 1997. Even assuming those 1997 actions were not barred by the statute of limitations, they occurred five years after he became a union

11

steward.  In Morris v. Lindau, 196 F.3d 102, 113 (2d Cir. 1999), the Second Circuit held that a two-year gap between the plaintiff's protected activity and the allegedly retaliatory action was too great, finding that "no inference of causation is justified."  Similarly, in Cobb the Second Circuit noted that the plaintiffs' presumably longstanding union membership made it "highly implausible" that their union association was a motivating factor in the discipline that was imposed on them.  363 F.3d at 109, citing Melzer v. Bd. of Educ., 336 F.3d 185 (2d Cir. 2003) (defendants' knowledge of the plaintiff's protected activity for many years made inference of retaliation "highly implausible"), cert. denied, ___ U.S. ___, 124 S. Ct. 1424 (2004), and Strahan v. Kirkland, 287 F.3d 821, 826 (9th Cir. 2002) (same).[2]

Since no inference of retaliation can be drawn from the "temporal proximity" between the protected activity and the allegedly retaliatory acts, one must look for "evidence of retaliatory animus."  Cobb, 363 F.3d at 108.  No such evidence exists.  Asked if Martin ever gave him any indication that he had a problem with Rinaldi's union activities, the plaintiff unequivocally responded, "no."  Rinaldi Dep., App. at 115, Trans. pp. 59, line 24 through 60, line 2.  With respect to Oldenburg, Rinaldi indicated that there "were a few times when I wasn't allowed to go to certain functions or meetings," and "there were some comments that he didn't agree with the union position on things."  Rinaldi Dep., App. at 115-16, Trans. pp. 60, lines 3-23; 62, line 20 through 63 line 6.

---

[2] It is noteworthy, as well, that Oldenburg was Rinaldi's immediate supervisor during the entire time that he was a union steward.  Oldenburg gave Rinaldi ten evaluations over his career.  The overall ratings were:  satisfactory (1991), good (1992), good (1993), satisfactory (1994), satisfactory (1995), good (1996), unsatisfactory (1997), satisfactory (2000), fair (2001), and satisfactory (2002).  SMF, ¶ 29.  Thus, Rinaldi's performance ratings actually improved after he first became a union steward, and fluctuated thereafter with no discernable pattern.  See Oldenburg Affidavit, App. at 123, ¶ 9.

However, Rinaldi admitted that Oldenburg did not give him any trouble about being absent from work while representing people as a union steward, and did not recall Oldenburg making any harsh remarks suggesting that he had a "personal gripe" with the union. Id., App. at 115-16, Trans. pp. 60, line 24 through 61, line 5; 65 lines 1-13.

Martin was himself a union member from the time he joined the State Police in 1986 until he was promoted to Lieutenant in 1995. SMF, ¶ 25. As a manager, Oldenburg was not able to be a union member. However, during the entire time he work for the Department of Public Safety, he paid dues to the union so that he could have union representation if he needed it. SMF, ¶ 27. His participation in this program is certainly at odds with any inference of anti-union bias.

Plaintiff was questioned at his deposition concerning his evidence of retaliation. His explanation, however, suggests that even he does not believe that anti-union animus motivated the defendants he has chosen to sue in this action. Asked what incidents led him to believe that Martin had a problem with his activities as a union steward, the plaintiff testified as follows:

> I don't – well, I believe it was because of the result of the stipulated agreement [settling his grievance on the 1998 discipline]. . . . I think it goes back to that. Whether or not the union is involved – I mean, **whether or not his treatment of me had anything to do with the union is secondary** as to what he wanted to do with me. . . .
>
> [A]s I said earlier, when – at the time this incident occurred it is my belief that the agency wanted me fired. . . . So [the Office of Labor Relations] said no, you know, you're going to give him back his title, and you're going to train him and do – you know, go forward. And it is my belief because of all the occurrences, incidences of the way I was treated, that Captain Martin did not know what to do with me. He did not want me there; his predecessor wanted me fired.
>
>> What this boils down to is that I think it – not to make – not to confuse this further, but I think the whole thing started as a personal attack

13

>against me, and that's where this comes in with the union.  As a union steward.

Rinaldi Dep. App. at 114-15, Trans. pp. 57, line 11, through 58, line 15 (emphasis added).  When asked what led him to conclude that "the whole thing started" as a personal attack because of his union activities, he indicated that it was because of the harshness of the penalty that was imposed on him in 1998.  App. at 115, Trans. pp. 58, line 16 through 59, line 1.

As this lengthy explanation makes clear, the plaintiff is not claiming that the defendants' alleged mistreatment of him occurred because they harbored anti-union animus; rather he claims it occurred because they didn't know what to do with him after he had been transferred to work as a computer programmer under their supervision.  His claim of retaliation is based, not on what the defendants did, but on the discipline he received in 1998.  That decision was not made by either of the defendants.  SMF, ¶¶ 13 & 17.  Again, personal involvement in the allegedly wrongful actions is the touchstone of liability under Section 1983.  Ayers v. Coughlin, 780 F.2d 205, 210 (2d Cir. 1985).  Moreover, as noted above with respect to plaintiff's equal protection claim, the 1998 disciplinary action is outside of the statute of limitations, and is precluded from consideration in this action by virtue of the plaintiff's written waiver of "any future claims in any forum" concerning that discipline. SMF, ¶ 15.  See supra p. 8 & n. 1.

There is no evidence from which a reasonable jury could conclude that either defendant took actions against the plaintiff in retaliation for his union activities.  In the absence of such evidence, they are entitled to judgment as a matter of law.  See Cobb, 363 F.3d at 107.

14

## **CONCLUSION**

The plaintiff cannot make out a prima facie case of an equal protection violation, nor can he demonstrate retaliation for exercise of First Amendment rights. Accordingly, the defendants are entitled to judgment as a matter of law on both counts of the Amended Complaint.

          DEFENDANTS,
          Scott Martin and Fred Oldenburg, Jr.

          RICHARD BLUMENTHAL
          ATTORNEY GENERAL


BY:    _____
          Mark P. Kindall
          Assistant Attorney General
          55 Elm Street
          P.O. Box 120
          Hartford, CT 06141-0120
          Tel: (860) 808-5340
          Fax: (860) 808-5385
          Federal Bar No.: ct13797
          E-Mail: Mark.Kindall@po.state.ct.us

## **CERTIFICATION**

I hereby certify that a copy of the foregoing Memorandum of Law was mailed this

2d day of June, 2004, first class, postage prepaid to:

John R. Williams, Esq.
WILLIAMS & PATTIS, LLC
51 Elm Street, Suite 409
New Haven, CT 06510

                                                                                             _____
Mark P. Kindall
Assistant Attorney General